GOODE *et al., Appellants,* v. THE CITY OF ST. LOUIS *et al.*

**Division One, December 22, 1892.**

1. **Contracts**: WORDS: PRESUMPTION. Persons in the making of contracts or the execution of instruments affecting their property are presumed to employ words in their usual sense, and not otherwise, unless the contrary clearly appears.

VOL. 113—17

2. **Land**: PUBLIC USE: MEANING OF TERM "COMMON." Land adjoining the city of St. Louis was by the original proprietors platted and laid off in blocks and lots, and as to a designated part it was indorsed on the plat "to be and remain a common forever." Afterwards the limits of the city were extended so as to include the property mentioned in the plat. *Held*, that the term "common" is not to be construed in its strict technical sense as being a right of profit which one person may have in the land of another, but as a piece of ground left open for common and public use for the convenience and accommodation of the inhabitants.

3. **Contract**: CONSTRUCTION: USAGE. Usage will sometimes give or fix a meaning to a contract.

4. **Land**: COMMON: MISUSER. The evidence in the case *held* not to show a misuser of the land dedicated as a common.

5. ———: ———: REVERSION. Property dedicated to a public use or to a particular use does not revert to the original owner except where the execution of the use becomes impossible. If the dedicated property be appropriated to an authorized use, equity will cause the trust to be observed or the obstructions to be removed. (*Campbell v. City of Kansas*, 102 Mo. 326, *distinguished.*)

6. ———: ———: ———: EQUITY: ESTOPPEL. Where the donors of land abutting on a river as a common standby for nearly forty years, and without objection, allow the city to expend nearly $1,000,000 in constructing wharves, etc., whereby it has converted a small piece of swampy ground into a noble square and wharf ten times the size of the original dedication, and other persons in the vicinity have acquired rights relying in good faith on the continuance of the public use in the common, the heirs of such donors are estopped in equity to claim a reversion of the land because of misuser.

*Appeal from St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.

AFFIRMED.

IN 1816, Chambers, Christy & Wright were the owners of a tract of land lying outside and north of the then existing limits of the city of St. Louis. They platted the tract, laying it off in lots and blocks, streets, etc. A portion of the tract thus owned, a strip of ground varying in width from seventy to one hundred feet and about thirteen hundred feet long,

running north and south and lying between Front street (now Main street) and the river, was dedicated to the public use as shown by the subjoined plat.

The words of dedication relating to this strip as indorsed on the plat are: "The land marked 'A' and bounded on the east by high-water mark, by lot number 13 on the north, Front street on the west and by lot number 12 on the south, is to be and remain a common forever."

This strip thus designated by the letter "A" embraced all the ground which lies east of Front street and west of the high-water mark of the Mississippi river, and is now called "Exchange Square." Among other words indorsed on the plat were these: "The proprietors reserve to themselves and their legal representatives the exclusive right of keeping all ferries to and from the town." At the time this plat was made, there was no town covering the ground thus platted; but one was contemplated by the dedicators to be known by the corporate name of "North St. Louis;" but no such town then existed or afterwards became incorporated. In 1841 the limits of the defendant city were extended so as to embrace all the property included in the plat.

At the time of the dedication the property marked "A" was the only landing place in the northern part of what is now the city of St. Louis; all boats, ferries, scows and rafts landed there, and there was no point on the Mississippi river, inside of the present northern city limits, other than this for such landings. The ferries plying between the Missouri and Illinois shores landed at this point, and emigrants, movers, gardeners and travelers coming from Illinois camped there. There were a great number of saw-mills in that vicinity, and logs were taken from the river at that point and hauled out on the common; boats loaded

with sand to be used for building purposes also landed there. All these methods of so using the "common" during the long years of habitual use of the same were continued from the time the city first obtained control, with the knowledge and consent of the original proprietors, and down to the time of their death; since that time the property has been put to similar uses. Some forty-eight years before this cause was heard, the main channel of the Mississippi river washed the front line of the dedicated strip in its original shape, and boats ran along there. This strip was low and wet and subject to overflow; every June the spring freshets would come and cover the strip with two or three feet of water. About this period a boat sank in the channel just above the public landing mentioned, and caused a sand bar to form there, and the river having in consequence changed its channel to a point far eastward of the original front line of the strip, and the city desiring to extend its wharf system in front of the property, negotiations were opened between the city and heirs of Chambers, Christy & Wright, which resulted in the deed of 1853 being made between such heirs and the city, whereby there was conveyed to the city absolutely all the accretions to the tract of land between the wharf and Jefferson street, east of the old high-water mark, as shown on the plat of 1816, for the purposes of a wharf, and also all of the balance of the land originally dedicated, and all the accretions thereto, for the use to which it was originally dedicated, and in connection with the interest of the wharf. The proviso in that deed was as follows: ''Provided, however, that said city shall not use said last named piece of land (Exchange Square) hereby conveyed for any other than such purposes as Exchange Square was originally dedicated by the proprietors aforesaid, etc.''

This deed was put to record in January, 1854, and

among its conditions was that the city should establish and build the wharf then agreed upon from Cherry street to the northern city limits, and that one half of the whole wharfage annually collected by the city after the second Monday in April, 1853, should be expended and applied on the wharf, etc. Complying with this condition, the city expended in front of "Exchange Square," between the years of 1860 and 1889, the sum of $77,109.99 in the construction of the wharf and levee, and the further sum of $17,131.02 in grading, filling and improving that square, making in all a total of $94,241.01, expended in improving the property for public use.

Owing to the sinking of the boat as already stated, resulting in the formation of a sand bar, a pressing necessity arose for the construction of two dikes, one at North Market and the other at Montgomery street. The city began to build these dikes in 1860, about the time it began to improve "Exchange Square" and to build the wharf; and, in thus building the dikes and improving the wharf in this vicinity, expended about $750,000 in addition to the sums already stated. After the dikes were built, all the space between them was gradually filled up to grading, the last filling being done in the summer of 1888, and, without such dikes, filling, etc., "Exchange Square" would have been a worthless piece of property; but, in consequence of the improvements aforesaid, and the accretions which have been thereby protected, the present common or "Exchange Square," is now nearly one thousand feet wide and about thirteen hundred feet long, constituting an ample and commodious wharf and landing place for boats in front of the property. At one time there were some one hundred or two hundred trees planted out on the square, some ten years before the hearing, which occurred in January,

1889, but in process of time those trees and the fence which inclosed them disappeared.  No street has ever been established across the square, but, as the accretions caused the river to recede, it became necessary in order to reach the river bank over a low, muddy place, North Market street was prolonged east of First street, by filling up a passage-way across the low lands so as to reach the ferry.  This filling up process of a passage-way was done from time to time as the river receded.

The ordinance authorizing the leasing to Timany a portion of ground for fifteen years at a yearly rental of $600 only covers a portion of the *wharf* for which the city had received from the ancestors of plaintiffs an absolute conveyance under the terms of the deed of 1853, and which portion the city by ordinance had been given the power to rent.

On Exchange Square there are no permanent structures, except some railroad tracks of the Wabash Western Railway Company and of the St. Louis Transfer Railway Company cross small portions of the original common, extending thence diagonally along the wharf.

The evidence also shows that, since 1853, by permission of the city, portions of the grounds conveyed by the heirs of Chambers, Christy and Wright, have been used as lumber yards and other similar purposes; this has been done under temporary arrangements made and extended from time to time, in consequence of which very little of the made ground remains but what is devoted to some public or commercial use; it is in evidence, however, that the original common continues to be open and uninclosed, and that the whole tract, inclusive of accretions, is still used for a variety of public purposes, and among them that of a public landing place along the river.  One witness

residing very near to the litigated property testified that a whole block, nearly one eighth of the whole square, was bare, naked common, recently filled up, had been left open to pass merchandise from the railroad track.

Plaintiffs' witness Cozzens further testifies that, if the lumber is taken off of the square, there is nothing to prevent its being used by the public, and that the lumber could be taken away with very little trouble. Witness further testifies that the square could be converted into a common in ten days, and that when the lumber is removed the property would be level and smooth. The same witness testifies that if the lumber was taken off there is nothing to prevent making the square a park except improving it.

On the seventeenth of May, 1879, the present litigation was begun, all the heirs of Chambers, Christy and Wright, except Mrs. Tyler, were made parties plaintiff, and the city of St. Louis, Mrs. Tyler, J. K. Cummings and others, defendants.

An amended petition was filed April 21, 1887, and the cause heard thereon. The Wabash Western Railway Company was at its own request made a party defendant.

The plaintiffs in their petition among other things charge; "That there is now no portion of said Exchange Square which is not granted, leased or transferred to some corporation or individual by defendant city, at an agreed remuneration, which defendant city receives for such lease or privilege, to the exclusion of any public enjoyment thereof, and in open and reckless defiance and in disregard of the terms of the said dedication, under and by virtue whereof the said defendant city enjoys the right of regulation of the public use thereof. Plaintiffs allege that the said defendant, by sundry other ordinances and acts, has used said tract for the

purpose of obtaining revenue therefrom, and has appropriated said tract to its own use in such a manner as to prevent its use as a common by the public. That, by reason of the growth of the city of St. Louis, and of the change of character of that portion of said city adjacent to Exchange Square, and of the surroundings of said Exchange Square, and of the hereinbefore recited acts of defendant, and by reason of the location, situation and present condition of said square, the objects and purposes of said dedication have utterly failed and been rendered impossible of attainment, so that said square is not now and cannot ever be used as a common, and its use as such has finally and forever been abandoned by the public.

"And plaintiffs allege that said land has never been used as a common since the same has been within the corporate limits of the city of St. Louis, but that since that time said defendant city has treated said square as its own property and has refused and still refuses to allow said property to be enjoyed in common by the people for the purposes for which it was dedicated, and by its acts has rendered such use impossible."

A decree was prayed for declaring that the title to said tract has reverted to and been vested in plaintiffs, and asking that all title to the property or right of control on the part of the city be divested and held for naught, and that the city be compelled to repay to the plaintiffs the sum received by it for rental of portions of said tract, and for ferry privileges.

The answer of the city was a general denial.

The railroad company set out the various ordinances of the city under which it had a license to occupy the portions of the square described above with its railroad tracks. These ordinances were passed by the city on June 30, 1854, and March 30, 1855, and

## EXPLANATION OF THE ANNEXED PLAN.

The streets running parallel to the river are eighty feet wide.

Market street is one hundred feet wide.

All other streets are sixty feet wide.

The squares are two hundred and forty by three hundred feet.

The circle on the mound overlooking the town is set apart for a seminary of learning.

The circle, number 2, on the hill is set apart for such public purposes as the proprietors or their legal representatives may think proper to apply it.

The circle, number 3, is set apart for the purpose of erecting a house of worship thereon and a burying ground to be open for the interment of all denominations of religious persons.

The land marked A and bounded on the East by high-water mark, by lot number thirteen, on the North, Front street on the West, and by lot number twelve on the South is to be and remain a common forever.

Scale two hundred feet to the inch. Course of the lines parallel to the river running up the same, North 29 degrees 30 minutes West. Those at right angles running from the river South 60 degrees, 30 minutes West running to the magnetical course.

True meridian 8 West of the magnetical course.

THE CONDITIONS ON WHICH THE PROPERTY IN NORTH ST. LOUIS IS NOW OFFERED FOR SALE JUNE, 1816.

1st. The proprietors reserve to themselves and their legal representatives the exclusive right of keeping all ferries to and from the town.

2d. The proprietors reserve to themselves and their legal representatives the use of all the town property West of the lower side of Sixth street until the inhabitants of the said town apply them to the purposes for which they are appropriated.

3rd. The building formerly occupied by Louis Labeaume, Esq., falling in Second street, the proprietors reserve to themselves, their heirs, etc., so much of the said street as they occupy and as much of the land adjacent to them as to enable the proprietors, their heirs or assigns to occupy them with convenience until they decay.

4th. The proprietors reserve to themselves the right of removing all the fruit trees now on the ground.

5th. The proprietors reserve all the fencing and rails now on the premises to their own use.

6th. To all such lots as are now under cultivation, possession will be given at any time after the first day of January, 1817.

WM. CHAMBERS,
W. CHRISTY,
THOMAS WRIGHT.

this defendant has been in peaceable and undisturbed possession of said portions of said square, under said license, up to this time.

Among the stipulations of counsel to be found preserved in the record is the following: "It is agreed that there is in evidence in this case the same facts as to the city observing the conditions of the deed of 1853 that were before the supreme court in the case of *St. Louis v. Ferry Co.*, 88 Mo. 615."

Other facts, where necessary, will be stated hereafter. Having heard the evidence the circuit court dismissed the petition and the plaintiffs appealed.

*Robert W. Goode* and *Charles M. Napton* for appellants.

(1) This was a common-law and not a statutory dedication; consequently the right to possession and use only and not the fee simple passed out of the dedicators. (2) The land could not lawfully be used for any other purpose than as a common. (3) The right granted was usufructuary, not perpetual, and continued only while the land was being used as a common. (4) The right has been extinguished. *First.* By non-acceptance on the terms of the original dedication. *Second.* By voluntary non-user of the land for the purpose of the dedication. *Third.* By voluntary diversion from the purpose of the dedication. (By adding it to the wharf.) *Fourth.* By use inconsistent with its use as a common. *Fifth.* By estoppel through acquiescence in admissions of record made and ordinances passed by the city. *Sixth.* By its abandonment as a common. *Seventh.* By practical impossibility of its further use as a common, and by its environment and the changes brought about by lapse of time. (5) According to Worcester's Dictionary

a "common" is "an open ground, the use of which is not appropriated to any individual, but belongs to the public or to many persons, public uninclosed space;—a term sometimes applied to an inclosed public ground or park, in a city." The court must declare a forfeiture if the dedicated property cannot or will not be used for the dedicated purposes. In this case the dedicated property cannot and will not be used for the dedicated purposes, as shown by the evidence; therefore, the court will decree a forfeiture of the dedication unless the doctrine of *"cy pres"* can be applied. (6) The doctrine of *"cy pres"* cannot be applied to this dedication; and therefore equity will decree a forfeiture. The doctrine of *"cy pres"* refers only to devises or bequests for charity or charitable uses. 2 Story on Equity Jurisprudence, sec. 1169, 1172; *Heaser v. Harris*, 42 Ill. 425; *Vidal v. Girard*, 2 How. U. S. 127. (7) The principle is applied only to sustain devises and bequests for charity, and to sustain perpetuities attempted to be created by will. But this whole matter is settled by the cases of *Campbell v. Kansas City*, 102 Mo. 326; Bouvier's Law Dictionary, and cases cited under title *"Cy pres;"* Burrill's Law Dictionary, and cases cited under title *"Cy pres;"* Rapalje & Lawrence Law Dictionary, and cases cited under title *"Cy pres."* *Miller v. Chittenden*, 2 Iowa, 368. (8) The question as to whether municipal corporations have the right to accept gifts or acquire property burdened with conditions which require them to do reasonable things germane to the objects of their existence, or return the gift or acquisition to the grantor or his heirs, is hardly to be considered an open question in this country. *Clarke v. Inhabitants, etc.*, 81 Mo. 503, 514, and cases cited therein. See also *Lee v. Mound Station*, 5 West. Rep. 329; *Cummings v. City*, 90 Mo. 257; *Belcher Sugar Co. v. Co.*, 82 Mo. 121; *Warren v. City*, 22 Iowa,

357.  (9) The use of dedicated property, so as to finally prevent its use for the dedicated purpose, works a forfeiture of the dedication. *Wellington Petitioners*, 16 Pick. 87; 2 Smith's Leading Cases [5 Am. Ed.] 222; *Price v. Thompson*, 48 Mo. 361; *Leclerq v. Town, etc.*, 7 Ohio, 217; *Trustees of Church, etc., v. Town of Hoboken*, N. J. (Law) 13; *Kirk v. King*, 3 Pa. St. 436; *State v. Mayor*, 5 Porter (Ala.) 291; *Pomeroy v. Mills*, 3 Vt. 279. (10) An indulgence in the breach of a condition subsequent is not construed as a waiver of the breach. *Belcher v. Co.*, 82 Mo. 121. (11) The statute of limitations constitutes no defense in this case. The fee has always been in plaintiffs, the city or public having only an easement. 2 Dillon on Municipal Corporations [3. Ed.] 653; 2 Perry on Trusts, [3 Ed.] sec. 920; *McRoberts v. Mondy*, 19 Mo. App. 31; *Gibson v. Armstrong*, 7 B. Mon. 489. (12) Every question in this case has been decided in plaintiffs' favor in *Campbell v. Kansas City*, 102 Mo. 326.

*W. C. Marshall* for city of St. Louis.

(1) The evidence does not show, as contended by appellants, that the city did accept control of the property as a common in the terms of the grant and that ever since the year 1841 the city has treated it as its exclusive individual property.  (2) The land in controversy is now and always has been a common for the use and purposes originally intended by the donors, to-wit: As an open space or wharf at a ferry landing to be used for the purposes of commerce and largely for storing lumber for commercial purposes.  (3) There is no evidence disclosing a diversion of the use.  Certainly the use has not become impossible.  (4) The facts in the case of *Campbell v. City of Kansas* are very different from those in this case.  In the *Campbell Case*

there was abandonment, acquiescence of the public, and the exercise of police power. In this case there has been no diversion of the use, no abandonment by the city, no acquiescence by the public, but, on the contrary, the attempt of the city, conniving with these plaintiffs to divert the use, was enjoined by Mr. Cummings, an interested citizen, and was sharply reprimanded by this court, on page 263 (90 Mo.) where it used this language: "It must follow that the proposed out and out sale is a flagrant abuse of the trust reposed in the city and without any warrant or authority of law." (5) "Property unconditionally dedicated to public use, or to a particular use, does not revert to the original owner, except where the execution of the use becomes *impossible*. If the dedicated property be appropriated to an unauthorized use, equity will cause the trust to be observed or obstructions removed." 2 Dillon on Municipal Corporations [4 Ed.] sec. 653, p. 773, and cases cited in note 1; *Reid v. Board of Education*, 73 Mo. 295; *Curran v. Louisville*, 83 Ky. 628; *Rutherford v. Taylor*, 38 Mo. 315. It might further be urged that the dedication of this property constituted a charitable use for the benefit of the people. See Lord Camden's definition in *Jones v. Williams*, Boyle on Charities, p. 51, and that, where property has been donated to charitable uses, neither the donor himself nor his heirs can ever reclaim it. *Acad. of Visitation v. Clemens*, 50 Mo. 167; *Goode v. McPherson*, 51 Mo. 126; *Russell v. Allen*, 107 U. S. 102.

*M. McKeag* for respondent Cummings.

(1) The court has already construed the dedication in this case. The purposes for which it was dedicated, the definition of the word *common* and the

relation that at least two of the respondents bear to this common are decided in *Cummings v. City of St. Louis*, 90 Mo. 259. (2) The dedicators in cases like the one at bar are presumed to have in contemplation all the uses generally made of a common; all such as the necessities of the public may subsequently require, and, so long as the use is consistent with and germane to that for which it is dedicated, no reversion can take place. *Julia Building Ass'n v. Telephone Co.*, 88 Mo. 258. (3) The same doctrine applies whether the dedication be for road, street or public square, wherever the question of proper use arises. (4) If the city neglects its power to regulate, or misconstrues the use, neither of these can wipe out the rights vested in John K. Cummings. *Trustees v. Cowen*, 4 Paige, 510; *City of Cincinnati v. Lessees*, 6 Peters, 431; *Brown v. Manning*, 6 Ohio, 298; *Rowan v. Town*, 8 B. Mon. 232. (5) It is sufficient that the public has a right to the use of the whole land dedicated. *Parish, etc., v. Foulhouse*, 30 La. (pt. 2), p. 64. (6) Courts of equity protect and continue uses like these at bar rather than countenance their destruction. *Ibid.*

*F. W. Lehman* and *G. S. Grover* for respondent Wabash Western Railway Company.

(1) The dedication of the tract in question "to be and remain a common forever," was not a dedication of it to the single use of a pleasure park nor a limitation to analogous uses, but was broadly a dedication to any and all public uses to which the tract was adapted. Anderson's Law Dictionary; Black's Law Dictionary; *Bath v. Boyd*, 1 Ire. (N. C.) L. 194; *White v. Smith*, 37 Mich. 291; *Cincinnati v. White's Lessees*, 6 Peters, 431; *Commonwealth v. Alburger*, 1 Whart. 469; *Crawford v. Railroad* 67 Ga. 405;

*Newport v. Taylor*, 16 B. Mon. 699; *Scott v. Des Moines*, 64 Iowa 438; *State v. McReynolds*, 61 Mo. 203; *Cummings v. St. Louis*, 90 Mo. 259; *Julia Building Ass'n v. Telephone Co.*, 88 Mo. 258. (2) The diversion of the "common" from the uses to which it was dedicated will not cause it to revert, unless it is made to appear, which was not done in this case, that those uses have become extinct and impossible of continuance. Dillon on Municipal Corporations [2 Ed.] sec. 515; *Campbell v. Kansas City*, 102 Mo. 326. (3) There is no equity in the plaintiff's case, and they are barred from now asserting their claims by their own laches, and by consenting at the time to all the matters and things now complained of by them. *De Herques v. Marti*, 85 N. Y. 609; *Ritcher v. Dove*, 99 Ind. 175; *Brown v. Bowen*, 30 N. Y. 541; 5 American & English Encyclopedia of Law, 402; *Jones v. Railroad*, 79 Mo. 92.

SHERWOOD, P. J.—I. The contention in this case in part turns on the meaning of the word *"common,"* to the purposes of which the litigated property was by the original proprietors dedicated "forever."

Counsel for plaintiffs insist that the word in question has a more restricted meaning than is usually attributed to it, and, in support of their view, that it means *"park"* or *"pleasure ground,"* cite the definition of Worcester, "An open ground, the use of which is not appropriated to any individual, but belongs to the public, or to many persons; public, uninclosed space— a *term sometimes applied to an inclosed public ground or park*, in a city." The words which we have italicized, sufficiently show what the ordinary signification of the term *"common"* is, and what the *exceptional;* and that the latter meaning applies to the words in italics. Parties in making contracts or in the execution of

instruments, which will bind them or their interests or affect their property, are presumed to employ words in their usual sense, and not otherwise, unless the contrary clearly appears, because this is the customary way of transacting such business. If we resort to other standards of our language, we find that Webster defines the word in question: "An uninclosed tract of ground, the use of which is not appropriated to an individual, but belongs to the public or to a number." In another standard work it is defined: "A tract of ground, the use of which is not appropriated to an individual, but belongs to the public or to a number." Century Dictionary. And if searching further we turn to the same authorities, we find the word *"park"* defined: "A piece of ground inclosed for public recreation or amusement." Worcester. "A piece of ground within a city or town inclosed and kept for ornament and recreation." Webster. "A piece of ground, usually of considerable extent, set apart and maintained for public use, and laid out in such a way as to afford pleasure to the eye as well as opportunity for open air recreation." Century Dictionary.

So that looking alone to the standards of our language, we find that "common" is by no means the synonym of "park" or "pleasure ground," but possesses a much more comprehensive meaning. But quitting lexicographers and turning to legal authorities and adjudicated cases, we find that "common" is defined as: "An uninclosed piece of land, set apart for public or municipal purposes, in many cities and villages of the United States." Black's Law Dictionary.

The adjudged cases hold the same views and give expression to a similar line of thought and theory. Thus the supreme court of the United States, when speaking of the word under discussion, as used by the proprietors: "We are not to understand the term as

used by them in its strict legal sense, as being a right or profit which one man may have in the lands of another; but in its popular sense, as a piece of ground left open for common and public use, for the convenience and accommodation of the inhabitants of the town." *Cincinnati v. Lessee of White*, 6 Pet. 431.

Smith made an addition to the village of Grand Rapids. At the intersection of two streets crossing diagonally was a piece of ground marked on the plat "common," and, touching the meaning of this marking, the supreme court of Michigan say: "This indicates an intention on the part of the owner to dedicate it to the public for any use which the proper authorities might deem proper, and which could be legitimately regarded as public. And although it is now claimed that at the time this plat was made the proprietor thereof did not fully understand the meaning of the word "common" as there used, yet we are of opinion that this can make no difference. A person is concluded by the words he deliberately adopts and uses in an instrument, whether he at the time fully understood their legal signification or not. The rights which third parties may acquire cannot be affected by the individual views or understanding of the proprietor in such a case." *White v. Smith*, 37 Mich. 291.

In platting the city of Philadelphia, there were several large squares on the plat, and on each was marked, "Eight acres for public uses." Afterward contention arose as to the legal effect of the dedication thus made, and in considering this question the supreme court of Pennsylvania said: "When property is dedicated or transferred to public use, the use is indefinite, and may vary according to circumstances. The public not being able themselves to manage or attend to it, the care and employment of it must devolve upon some local authority or body corporate as its

guardian, who are, in the first instance, to determine what use of it from time to time, is best calculated for the public interest, subject, as charitable uses are, to the control of the laws and the courts, in case of any abuse or misapplication of the trust. The corporation has not the right to these squares so as to be able to sell them, or employ them in a way variant from the object for which they were designed; but they may allow them to remain unimproved or unoccupied, while buildings are too remote to render it proper. They may afterwards 'use or permit them to be used for depositories of public property, such as paving stones or offals of the city, for hay scales, for a powder magazine, for a public burying ground, and finally, when a close population surrounds them, for recreation and ventilation, ornament and thoroughfares of the city.  *   *   *   In the same manner as to the public landings granted to the city by the founder and others in the adjoining districts, they were for a time unwharfed, then wharfed and used for landing of passengers and of lumber, afterwards for the cording of wood, and now several of the most valuable let out for steamboat landings and other commercial purposes. This has been the uniform practice, and is consistent with the objects for which they were bestowed." *Commonwealth v. Alburger*, 1 Whart. 469.

It is difficult to conceive of a case more closely resemblant of the one at bar than that of *Newport v. Taylor's Ex'r*, 16 B. Mon. 699.    In that instance on the plat of the town an open space appeared between the lots on Front street and the river, and was marked "the esplanade, to remain a common forever." Regarding the uses to which this open space thus marked could be applied, the supreme court of Kentucky say: "Was the esplanade to be a common of pasture, a

common of piscary, or a common of turbary? Was
the esplanade, one half of which or more was the
sterile shore and bank of the river, dedicated forever to
this restricted use of a town situated on the bank of a
noble river and seeking and expecting the advantages
of that situation? And was not the word 'common'
understood, and to be understood, not in its technical
sense, as being a right of profit which one man may
have in the land of another, but, in its popular sense,
'as a piece of ground left open for common and public
use, for the convenience and accommodation of the
inhabitants of the town.'   *   *   *   We are of opinion
that the dedication of the slip of ground in question as
a common by the plat of 1795, and by the act estab-
lishing the town, was a dedication of it as public ground,
for the convenience and accommodation of the town
and the public, and for such appropriate uses, exclusive
of the ferry right in Taylor, and not inconsistent with
it, as are to be implied in the dedication of a narrow
slip of open ground between the lots and a navigable
river, which include the right of constructing wharves
and charging wharfage, which has never before been in
contest between these parties.''

Similar declarations as to the meaning and full
import of the word ''common'' are to be frequently
found in other adjudicated cases which the industry of
counsel on behalf of defendants has brought to our
attention. *Crawford v. Railroad*, 67 Ga. 405; *Com-
missioners of Bath v. Boyd*, 1 Ire. L. 194; *Scott v.
Des Moines*, 64 Iowa, 438; *State ex rel. v. McReynolds*, 61
Mo. 203; *Cummings v. St. Louis*, 90 Mo. 259. In the
case last cited a definition of the word ''common'' is
given similar to that employed in *Cincinnati v. Lessee
of White, supra.*

Now, if the cases already cited give the correct defi-
nition of the word under discussion, and there are none

to the contrary, then it must needs follow that the city has not appropriated the common to purposes other than those implied in the term used. If this be conceded, then of course authorities cited by plaintiffs to the effect that property dedicated to one public use cannot be diverted to a purpose alien to that of its dedication, possess no possible relevancy to the point in hand. And even if the word "common" were not as well defined as it is, the contemporaneous construction given to it from 1841, certainly from 1853, a construction which has been continuous down to the present time, by the acts of the city and by the failure of the original proprietor, and those who now represent them, to interpose any objection or offer any obstacle to such construction, would of itself have indelibly fixed the meaning of that word in accordance with the practical every day meaning thus given it during the long series of years which have intervened between such contemporaneous construction and the present period. This would be the case as to contracts, and the contract of dedication forms no exception to the familiar rule as to usage giving or fixing the meaning of words. We hold then on this branch of the case that none of the purposes to which the city has applied the common or square have been at all variant from those originally intended. It is true that in the course of time the city authorities have permitted, perhaps encouraged by their licenses, a substitution of the rapid transit of railroad trains across the common in lieu and stead of the slow moving wagons of former times; but this is but a change in the *method of the public use and not in the use itself*, and such method is entirely germane to the purposes of the original dedication, and within the legitimate regulation and control of the municipal authorities. And the extension of North Market street across the square, so as expeditiously and safely to reach the

river bank, falls within the same line of remark; it was neither an abuse nor a diversion of the dedicatory trust committed to the hands of the city, but in entire keeping therewith. Indeed it might with great force of reason be urged that the city by its deed-contract of 1853, having accepted the common and agreed to build the wharf, which it has done in a manner worthy of commendation, and which has received the approval of this court (*City v. Ferry Co.*, 88 Mo. 615), had the right as an incident of the former one to construct a suitable pass-way in order to reach the wharf thus built.

II. But should it be granted that a diversion of the common from its original uses had occurred, still this concession would not aid the plaintiffs in their present endeavor to obtain for *their own use* this valuable property, and for the reason stated in *Barclay v. Howell's Lessee*, 6 Pet. 498, that: "If this ground had been dedicated for a particular purpose, and the city authorities had appropriated it to an entirely different purpose, it might afford ground for the interference of a court of chancery, to compel a specific execution of the trust, by restraining the corporation, or by causing the removal of obstructions. But, even in such a case, the property dedicated would not revert to the original owner. The use would still remain in the public, limited only by the conditions imposed by the grant."

On this topic, Judge Dillon remarks: "Property, unconditionally dedicated to public use or to a particular use, does not revert to the original owner except where the execution of the use becomes impossible. If the dedicated property be appropriated to an unauthorized use, equity will cause the trust to be observed or the obstructions removed." 2 Dillon on Municipal Corporations [4 Ed.] sec. 653 and cases cited; *Curran v. Louisville*, 83 Ky. 628.

In this case, counsel for plaintiffs expressly admit

"that there is a *physical possibility* of converting the *square* into a vacant tract of land." This admission entirely coincides with the statement made by a witness for plaintiffs, Cozzens, to the effect that *in ten days* all obstructions could be removed and the surface would be left level and smooth and thus converted into a common; and that if the lumber were taken off, that there is nothing to prevent making the square a park except improving it.

In the circumstances here presented, mere *nonuser* or *misuser* will not work a reversion; this is abundantly shown by the authorities If a departure be shown on the part of the officers of the city in the observance of the trust created by the dedication, resort must be had to a court of equity to compel a performance of the trust, or the obstructions thereto removed; but here no such departure has been shown, and, if anything could be deemed obstructions to the observance of the trust, the facility of their ready removal is both admitted and proven, and, more than that, since this proceeding was instituted, the plaintiffs have made a formal demand on the city that the land be cleared of obstructions and used as a common, "a very singular demand," as Judge DILLON aptly remarks, "if it was a thing *impossible* to be done."

III. It is however insisted that *Campbell v. City of Kansas*, 102 Mo. 326, gives full support to the claim of plaintiffs. This is a total misconception of the rulings in that case. There a certain square in the plat had marked thereon: "Donated for graveyard." It was used for that purpose for years. Subsequently the rapid growth in the population and size of the city, and considerations of the health of the city, necessitated the passage of an ordinance vacating the donated lot for future purposes of sepulture; requir-

ing the removal of the remains therein deposited, and fobidding its further use as a graveyard. This ordinance was passed in 1857 as a mere police regulation, power having been granted the city in 1853 "to make regulations to secure the general health of the inhabitants and to prevent and remove nuisances" Under this ordinance the remains were removed; the locality leveled to the grade of the surrounding lots; the place utterly discontinued as a graveyard, converted by the city authorities into a public park, sown in grass and planted in trees, and in all this the public acquiesced for some twenty-five years.

In such circumstances as these, it was held that the place had been discontinued and abandoned as to the purposes for which it had been originally dedicated, and therefore the heirs could claim a right of reverter and recover in ejectment. To state the facts in that case is to broadly distinguish it from the case at bar and to show that the doctrine laid down there is in harmony with the authorities heretofore cited in this, to-wit, that, owing to the legitimate exercise of the police power and the subsequent acts of the municipal authorities and of the public, the *execution of the use had become impossible.* This is the gist and theory of that case. See *Newark v. Stockton,* 44 N. J. Eq. 179.

IV. But, apart from all other considerations, the circuit court correctly ruled in dismissing plaintiff's petition, for these additional reasons. *They sue not to enforce the original trust, but to enrich themselves.* Thus, suing alone in their *individual* capacity and not as the vindicators of a public use disregarded and trampled upon as they claim by the municipality, they stand before this court as *ordinary suitors,* suing to obtain *private relief and to secure individual benefits.* They and their ancestors have stood silently by while the city in good faith, and during a period of time of nearly forty

Goode v. The City of St. Louis.

years, has expended nearly $1,000,000 in money and converted a narrow swampy, almost worthless bit of ground into a noble square and wharf nearly ten times as large as it was originally, and besides, meanwhile, others, some of whom are residents in the near vicinity, have also acquired rights in equal good faith of the continuance of the public use in the common in question. Considering the plaintiffs then in the light of mere private suitors and not otherwise, they are clearly estopped from seeking relief at the hands of a court of equity, either against the city or against those who have bought and improved land in the vicinity on the faith of the improvements aforesaid, which the city has made, and of the common and wharf continuing in its present shape and with its present commercial facilities.

It was on the score of possessing an interest such as this which caused this court to affirm the judgment of the circuit court, which, at the instance of a landowner who owned property some three blocks away from the square, enjoined the city from carrying into execution an ordinance which authorized a decree to be entered for the sale of the very property now in dispute, and the proceeds to be divided half and half between the city and the present plaintiffs. *Cummings v. St. Louis*, 90 Mo. 259.

We therefore hold, that, viewed in any light, the plaintiffs have no ground for relief, and hence affirm the judgment. All concur; BARCLAY J., in all that has been said; BRACE J., in all the paragraphs except number 3, as to which he dissents; BLACK J., concurs in all but the same paragraph, as to which he expresses no opinion.