52 So.2d 141

## ROACH et al. v. CITY OF TUS-CUMBIA et al.

### 8 Div. 490.

Supreme Court of Alabama.

Oct. 19, 1950.

Rehearing Denied April 26, 1951.

Travis Williams, Wm. Stell, Kennedy
Williams and Williams & Williams, all of
Russellville, for appellants.

Arthur L. Shaw and W. H. Shaw, of Tuscumbia, for appellees.

LIVINGSTON, Justice.

This suit was instituted by resident citizens and taxpayers of the City of Tuscumbia, Alabama, who own property abutting on what is known as "North Commons," and which is within the territorial limits of said city. It is against the city and others, and seeks to enjoin the city and others interested in the enterprise from the construction and maintenance of tennis courts within the limits of "North Commons." Demurrer to the bill, as last amended, was sustained and the bill dismissed, followed by this appeal.

The bill alleges that at the time the Town of Tuscumbia and its predecessors in name were incorporated, it included the lands known as "North Commons." In pertinent part the bill further alleges:

"The City of Tuscumbia was originally incorporated by the Legislature of Alabama on December 20, 1820, under the corporate name of 'Ococoposo.' By an Act of the Legislature of June 14, 1821, the name of Ococoposo was changed to 'Big Spring.' On December 21, 1822 the name Big Spring was changed by an act of the legislature to 'Tuscumbia.' At the time these acts of the legislature were passed the·

town was in Franklin County, Alabama, but when the County of Colbert was created the City of Tuscumbia became a part of Colbert County, Alabama.

"General John Coffee, a government surveyor, had prior to 1820 surveyed and plated township four, range eleven aforesaid and under authority of the federal government as shown by 3 Stat. 375 and 3 Stat. 467, selected the above described lands for a town site and surveyed and plated said lands and certified the same to the proper government authorities and the lots shown on said plat were ordered sold at public outcry. The public sale was held on October 6, 1820. The map and plat was certified to on March 6, 1920. The map and plat of said town site included the entire lands hereinbefore described. The lots as shown by said map and plat were numbered but there were no block numbers, each block containing four lots. The streets were 100 feet wide and each of them named on the plat and each lot was 165 feet wide on the North ends of the lots. The map and plat of the town site showed certain area near Big Spring and Big Spring Creek unplated for a park; and it also showed a strip of land extending entirely around, and constituting the outer border of said town site and within the aforesaid lands chosen and set apart for said town site. On said plat said strip of land was denoted as North Commons, East Commons, South Commons and West Commons. North Commons was 20 poles wide, East Commons 15 poles wide, South Commons 10 poles wide and West Commons 5 poles wide. The Commons constituted a right of way or parkway entirely around the remaining part of said town site, and was a part of the same. The Commons, the streets, lots and Big Spring Park constituted the entire town site and included the lands hereinbefore described. Only the numbered lots were sold by the government, but the passage way around the town and the park were thereby dedicated to the town and to the people of the town for public use and public purposes. Patents were issued by the government for the lots sold as· aforesaid and thereafter the town was incorporated by acts of the

legislature as aforesaid. About the time of incorporation of the old town of Tuscumbia the lands immediately north of the North Commons were conveyed by the government to private individuals..

"Complainants aver that when the government approved the plat and survey of the town site and ordered the lots therein sold, and when the same were sold, the streets, park and Commons were thereby dedicated by the government for public use of the citizens of the town and when the town was incorporated it accepted said streets, park and commons so dedicated by the Federal Government; and complainants further allege that the said commons was dedicated for and accepted by the public as a right of way or a general passage way around the town of Tuscumbia, and that the North Commons has been so used by the people of Tuscumbia continuously for more than a hundred years.

"Lots of the old town of Tuscumbia numbered 21 to 28 inclusive border on the North Commons and these lots lie between Main Street on the east and Milton Street on the west. After the extension of the corporate limits of the city of Tuscumbia north of North Commons, the property facing south on the commons lie between Main Street and Milton Street and just across North Commons from the lots described above. As the town of Tuscumbia grew, lots were divided and many homes were built on said lots facing north on North Commons and the only ingress and egress said property owners had or have was said North Commons; and as the town grew many homes were built on the lands north of the North Commons and facing on same, and said North Commons is the only ingress and egress said land owners have. A great many houses have been built facing, and many of them encroaching on the North Commons. The City of Tuscumbia built a sewer line along the center of the North Commons for servicing the homes on each side thereof; and constructed and maintains a water line near the south side of the North Commons for the use and benefit of the citizens along said Commons. The North Commons is now and has been for many

**482**

years a..right of way, street or· parkway used by the public .and by those whose homes and whose property borders on said commons. * * *

"When the corporate limits of the City of Tuscumbia was extended north of the North Commons about forty years ago, the city· extended the streets of the old town of· Tuscumbia across the commons and into and through the property of the city north of the commons, and some of the streets have been paved across the commons and other streets graded and graveled.

"During the more than one hundred years development of the town and City of Tuscumbia property owners, building· on both the north and south sides of the' part of North Commons between Main Street and Milton Street and elsewhere, encroached upon the commons until the North Commons now between Main Street and Milton Street on an average is less than two hundred feet wide.

"In 1935 the mayor and councilmen of the City of Tuscumbia filed application with WPA to obtain funds to grade and beautify North Commons as a parkway and later a committee of women of the City of Tuscumbia of whom Mrs. John W. Curry was chairman, were authorized to continue the efforts to obtain money to construct driveways, plant trees, shrubs and flowers along the North Commons. In the effort to obtain these funds some question was raised as to the title and ownership of the commons, and on August 16, 1937 [50 Stat. 651], an Act was passed in the Congress of the United States, relinquishing all title or claim the Federal Government had in the commons to the City of Tuscumbia and to the people of Tuscumbia and to all those who had equities in the commons. Said Act fully recognized the 'squatter rights of those who had encroached upon the commons and the equities which all property owners had in the use of the commons. A copy of said act of Congress is attached hereto and made a part hereof as Exhibit 'A'. Complainants allege that this act of Congress was a recognition of the right of abutting own-· ers and encroachers on the said commons and their right to use the said.. commons as a· right of way, street or parkway.

"After the passage of said act of Congress aforesaid, the citizens of Tuscumbia interested in making a parkway of the North Commons and beautifying the same, held a mass meeting at the invitation of the mayor of Tuscumbia, to determine the type of improvement which should be made and to what use the North Commons should be put. This mass meeting resulted in the draft of a city ordinance which was passed at a meeting of the city council of the City of Tuscumbia on December 6, 1937. A copy of said ordinance is attached hereto and made a part of this bill of complaint as Exhibit 'B'. Said ordinance dedicated the commons for public use exclusively as a right of way, street or parkway, and provided that no obstruction or encroachment upon said commons by fencing or building any kind of structure should ever be permitted and that the public should always have the unobstructed use of the same, and providing that said ordinance should never be repealed. Said ordinance was filed for record in the office of the Judge of Probate in Colbert County, Alabama on October 5, 1938 and recorded in Book 110, page 287, and the act of Congress made Exhibit 'A' was filed for record in the same office on the same day, and recorded in Book 110, page 288. Complainants allege that the above act of Congress and action of the city council of the City of Tuscumbia, was a recognition of the original dedication of the commons to the people of Tuscumbia, recognition of its long and continued use as a right of way, street or parkway, and a rededication of the same to the people of Tuscumbia forever. Complainants allege that now and at the time the hereinafter alleged obstruction was begun and accomplished, the North Commons between Main Street and Milton Street and all its length is and was a public right of way street or parkway, and the City of Tuscumbia, its officers, and the Tuscumbia Young Men's Club and its president, had no right whatsoever to obstruct any part of said North Commons and had no right and have no right to construct or

maintain the hereinafter alleged obstruction therein."

The bill further alleges that the construction and maintenance of the proposed tennis courts would constitute a nuisance and an unauthorized and illegal obstruction of the North Commons.

The theory of the bill is that the lands of complainants being coterminous with that known as "North Commons" they have such right to and ownership in the same extending to the center of North Commons, as authorize them to prevent its use in the construction and maintenance of tennis courts. This doctrine obtains in reference to streets and highways. The rule however is entirely different when applied to the ownership of land attingent to a public common. Sheffield & Tuscumbia Street Ry. Co. v. Rand and Moore, 83 Ala. 294, 3 So. 686.

First then, it is necessary to determine from the averments of the bill the character of the land involved; that is, whether a common, street, park, parkway, or other public right of way. On demurrer, of course, the bill is construed most strongly against the complainant who drew it. So considered, we feel no hesitancy in holding that it avers the existence of a common, as distinguished from a street, or park, etc. Perhaps that question has been foreclosed heretofore. In dealing with this identical land, this Court in the case of Sheffield & Tuscumbia Street Railway Co. v. Rand and Moore, supra, said: "Many years ago a town was laid off by survey, containing lots, streets, and a common. The streets and common were dedicated in the usual way, the lots were sold to private purchasers; the town built up; and it is now the incorporated city of Tuscumbia, having a municipal government with mayor and aldermen. Under an act of congress the town-site was selected before the sale of the public lands in that part of the state. The survey and sub-divisions of the land into lots, the location and dedication of the streets and common, and the sale of the lots, were done by commissioners appointed for the purpose. The original sale of the lots, as town lots, was made by the government of the United States.

It is not shown for what special use or purpose the common was withheld from sale and dedicated; but it has remained an open, uninclosed common ever since, apparently without improvement or ornamentation. It stretches across the northern part of the tract selected for the town-site, and extends to its northern boundary."

In the Rand case, supra, demurrers were sustained to the bill because the rights claimed under the bill could not be asserted in respect to a common.

Another question of pleading is, whether the bill of complaint avers the passage and continued existence of a valid, legal ordinance of the City of Tuscumbia dedicating the commons as a right of way, street or parkway.

Here, again, the rule is to construe the averments of the bill most strongly against the pleader. In the case of Pierce v. City of Huntsville, 185 Ala. 490, 64 So. 301, 304, it was held that resolutions of municipal boards calling for bids for paving streets, ordinances adopting or accepting bids and fixing assessments for benefits are not ordinances or resolutions of a general and permanent nature within sections 1185, 1252 and 1258, Code of 1907, now sections 456, 457 and 462, Title 37, Code of 1940. It was there said: "The proceeding for the assessment of the cost of a street improvement against the abutting property is administrative and judicial in its character. It is also local and special, and when its end is once accomplished, it is no longer a rule of conduct, but its interest is historical and evidential only. It is then consigned to the limbo of things which have served their purpose."

But an ordinance which has for its purpose, or under the terms of which, streets are laid out and dedicated according to a plan is certainly an ordinance of a permanent nature or intended to be of permanent and general operation. Being such an ordinance, section 462, Title 37, Code of 1940, requires that it shall be published in some newspaper of general circulation in the city or town, but if no such newspaper of general circulation is published within the limits of the corporation, such ordinance may be published by posting copies there-

of in three public places within the limits of the city or town, one of which places shall be at the post-office or the mayor's office, in such city or town. When the ordinance is published in the newspaper, "it shall take effect from and after the time it shall first appear in said publication, and when published by posting it shall take effect five days thereafter, except" as in section 462, supra, otherwise provided.

Before an ordinance of a general or permanent nature can become effective or operative its publication is just as essential as its passage; for the mere existence of an ordinance is no evidence that it is effective. Smith v. Town of Eclectic, 18 Ala.App. 329, 92 So. 212. One who relies upon an ordinance in the assertion of a right or defense must allege, in some way, its existence and effectiveness. The instant bill is defective in this regard. See, Sconyers v. Town of Coffee Springs, 230 Ala. 206, 160 So. 552, 554.

Having determined that, for aught appearing from the bill, complainants' property is attingent to a public common, the rules in respect to lands abutting on public streets, highways and parks have no application. Sheffield & Tuscumbia Street Railway v. Rand and Moore, supra.

Other than the Rand case, supra, no case is cited, nor has our search revealed one in which this Court has decided or discussed the rights of those owning lands attingent to or abutting on a common, in respect to the city's or town's control of it.

In our opinion one of the leading cases on the subject is Goode v. City of St. Louis, 113 Mo. 257, 20 S.W. 1048, 1051, decided in 1892. After our Rand case, supra, was decided. We quote at length from the Goode case:

"The contention in this case, in part, turns on the meaning of the word 'common,' to the purposes of which the litigated property was by the original proprietors dedicated 'forever.'

"Counsel for plaintiffs insist that the word in question has a more restricted meaning than is usually attributed to it, and, in support of their view that it means 'park,' or 'pleasure ground,' cite the defini-

tion of Worcester: 'An open ground, the use of which is not appropriated to any individual, but belongs to the public or to many persons, public, uninclosed space; a term sometimes applied to an inclosed public ground or park in a city.' The words which we have italicized sufficiently show what the ordinary signification of the term 'common' is, and what the exceptional, and that the latter meaning applies to the words in italics. Parties, in making contracts, or in the execution of instruments which will bind them or their interests or affect their property, are presumed to employ words in their usual sense, and not otherwise, unless the contrary clearly appears, because this is the customary way of transacting such business. If we resort to other standards of our language, we find that Webster defines the word in question. "An uninclosed tract of ground, the use of which is not appropriated to an individual, but belongs to the public or to a number.' In another standard work it is defined: 'A tract of ground the use of which is not appropriated to an individual, but belongs to the public or to a number.' Cent. Dict. And if, searching further, we turn to the same authorities, we find the word 'park' defined. 'A piece of ground inclosed for public recreation or amusement.' Worcester. 'A piece of ground within a city or town, inclosed and kept for ornament and recreation.' Webster. 'A piece of ground, usually of considerable extent, set apart and maintained for public use, and laid out in such a way as to afford pleasure to the eye as well as opportunity for open air recreation.' Cent. Dict.

"So that, looking alone to the standards of our language, we find that 'common' is by no means the synonym of 'park' or 'pleasure ground,' but possesses a much more comprehensive meaning. But quitting lexicographers, and turning to legal authorities and adjudicated cases, we find that 'common' is defined as 'An uninclosed piece of land, set apart for public or municipal purposes, in many cities and villages of the United States.' Black, Law Dict.

"The adjudged cases hold the same views, and give expression to a similar line of thought and theory. Thus the supreme court of the United States, when speaking of the word under discussion, as used by the proprietors: 'We are not to understand the term, as used by them, in its strict, legal sense, as being a right or profit which one man may have in the lands of another, but, in its popular sense, as a piece of ground left open for common or public use, for the convenience and accommodation of the inhabitants of the town.' City of Cincinnati v. Lessee of White, 6 Pet. 431 [8 L.Ed. 452].

"Smith made an addition to the village of Grand Rapids. At the intersection of two streets, crossing diagonally, was a piece of ground marked on the plat 'Common,' and, touching the meaning of this marking, the supreme court of Michigan say: 'This indicates an intention on the part of the owner to dedicate it to the public for any use which the proper authorities might deem proper, and which could be legitimately regarded as public; and although it is now claimed that at the time this plat was made the proprietor thereof did not fully understand the meaning of the word "common," as there used, yet we are of opinion that this can make no difference. A person is concluded by the words he deliberately adopts and uses in an instrument, whether he at the time fully understood their legal signification or not. The rights which third parties may acquire cannot be affected by the individual views or understanding of the proprietor in such a case.' White v. Smith, 37 Mich. 291.

"In platting the city of Philadelphia, there were several large squares on the plat, and on each was marked, 'Eight acres for public uses.' Afterwards contention arose as to the legal effect of the dedication thus made, and in considering this question the supreme court of Pennsylvania said: 'When property is dedicated or transferred to public use, the use is indefinite, and may vary according to circumstances. The public not being able themselves to manage or attend to it, the care and employment of it must devolve upon some local authority or body corporate as its guardian, who are, in the first instance, to determine what use of it from time to time is best calculated for the public interest, subject, as charitable uses are, to the control of the laws and the courts in case of any abuse or misapplication of the trust. The corporation has not the right to these squares, so as to be able to sell them or employ them in a way variant from the object for which they were designed; but they may allow them to remain unimproved or unoccupied while buildings are too remote to render it proper. They may afterwards use, or permit them to be used, for depositories of public property, such as paving stones or offals of the city; for hay scales; for a powder magazine, for a public burying ground; and, finally, when a close population surrounds them, for recreation and ventilation, ornament, and thoroughfares of the city. In the same manner as to the public landings granted to the city by the founder and others, in the adjoining districts, they were for a time unwharfed, then wharfed and used for landing of passengers and of lumber, afterwards for the cording of wood, and now, several of the most valuable, let out for steamboat landings and other commercial purposes. This has been the uniform practice, and is consistent with the objects for which they were bestowed.' Commonwealth v. Alburger, 1 Whart. [Pa.] 469.

"It is difficult to conceive of a case more closely resemblant of the one at bar than that of City of Newport v. Taylor's Ex'r, 16 B.Mon. [Ky.] 699. In that instance, on the plat of the town, an open space appeared between the lots on Front street and the river, and was marked, 'The Esplanade. To remain a common forever.' Regarding the uses to which this open space, thus marked, could be applied, the supreme court of Kentucky say. 'Was the esplanade to be a common of pasture, a common of piscary, or a common of turbary? Was the esplanade, one half of which, or more, was the sterile shore and bank of the river, dedicated forever to this restricted use of a town situated on the bank of a noble river, and seeking and expecting the advantages of that situation? Was not the word "common" understood,

and to be understood, not in its technical sense, as being a right or profit which one man may have in the land of another, but in its popular sense, "as a piece of ground left open for common and public use, for the convenience and accommodation of the inhabitants of the town?" * * * We are of opinion that the dedication of the slip of ground in question as a common, by the plat of 1795, and by the act establishing the town, was a dedication of it as public ground, for the convenience and accommodation of the town and the public, and for such appropriate uses, exclusive of the ferry right in Taylor, and not inconsistent with it, as are to be implied in the dedication of a narrow slip of open ground between the lots and a navigable river, which includes the right of constructing wharves and charging wharfage, which has never before been in contest between these parties.'

"Similar declarations as to the meaning and full import of the word 'common' are to be frequently found in other adjudicated cases which the industry of counsel on behalf of defendants has brought to our attention. Crawford v. Mobile & G. R. Co., 67 Ga. 405; Commissioners of Town of Bath v. Boyd, 1 Ired., N.C., 194; Scott v. City of Des Moines, 64 Iowa, 438, 20 N.W. 752; State ex rel. Patterson v. McReynolds, 61 Mo. 203; Cummings v. City of St. Louis, 90 Mo. 259, 2 S.W. 130. In the case last cited, a definition of the word 'common' is given, similar to that employed in City of Cincinnati v. Lessee of White, supra.

"Now if the cases already cited give the correct definition of the word under discussion,—and there are none to the contrary,—then it must needs follow that the city has not appropriated the common to purposes other than those implied in the term used. If this be conceded, then, of course, authorities cited by plaintiffs to the effect that property dedicated to one public use cannot be diverted to a purpose alien to that of its dedication possess no possible relevancy to the point in hand. And, even if the word 'common' were not as well defined as it is, the contemporaneous construction given to it from 1841,—

certainly from 1853,—a construction which has been continuous down to the present time, by the acts of the city and by the failure of the original proprietors and those who now represent them to interpose any objection or offer any obstacle to such construction, would of itself have indelibly fixed the meaning of that word in accordance with the practical, every day meaning thus given it during the long series of years which have intervened between such contemporaneous construction and the present period. This would be the case as to contracts, and the contract of dedication forms no exception to the familiar rule as to usage giving or fixing the meaning of words. We hold, then, on this branch of the case, that none of the purposes to which the city has applied the common or square have been at all variant from those originally intended. It is true that in the course of time the city authorities have permitted—perhaps encouraged, by their licenses,—a substitution of the rapid transit of railroad trains across the common in lieu and stead of the slow-moving wagons of former times; but this is but a change in the *method of the public use, and not in the use itself;* and such method is entirely germane to the purposes of the original dedication, and within the legitimate regulation and control of the municipal authorities. And the extension of North Market street across the square, so as expeditiously and safely to reach the river bank, falls within the same line of remark. It was neither an abuse nor a diversion of the dedicatory trust committed to the hands of the city, but in entire keeping therewith. Indeed, it might with great force of reason be urged that the city, by its deed contract of 1853, having accepted the common, and agreed to build the wharf, —which it has done in a manner worthy of commendation, and which has received the approval of this court,—(City of St. Louis v. Wiggins Ferry Co., 88 Mo. 615), had the right, as an incident of the former one, to construct a suitable pass-way in order to reach the wharf thus built."

 In the instant case the land was granted or dedicated by the United States Government. No terms, restrictions or lim-

itations upon the use of the land was impressed. Therefore, the rules in respect to a grant or dedication with terms or conditions annexed are not here applicable. In the case of Langley v. The Mayor and Trustees of the Town of Gallipolis, 2 Ohio St. 107, it is said: "Although the manner of dedication, and the principles and rules of property applicable to public highways and public squares, may rest upon the same ground, yet the use and purpose of each is different and clearly distinguishable from the other. The easement of a public way, the legal incidents of which are well defined, comprehends the rights of all individuals in the community, whether upon foot, on horseback, or with any kind of vehicle, to pass and repass, together with the right of the public to do all the acts necessary to improve it and keep it in repair. But the use and beneficial purposes of a public square or common, in a village or city, where no special limitations or use is prescribed by the terms of the dedication, are entirely different from those of a public highway. Such a place, thus dedicated to the public, may be improved and ornamented for pleasure grounds and amusements for recreation and health; or it may be used for the public buildings and place for the transaction of the public business of the people of the village or city, or it may be used for purposes both of pleasure and business. Any such appropriation may be made under the direction and control of the municipal authorities; but the place must, for the purposes of the dedication, remain free and common to the use of all the public. And an appropriation to the purposes of a mere public highway, or the private and individual use and purposes of any lot owner or particular class of lot owners in the village or city, of ground dedicated as that in question, would be inconsistent with the objects of the dedication, and a plain diversion from its appropriate and legitimate uses."

It appears from the bill of complaint that by permission and approval of the governing body of the city the Young Men's Club of Tuscumbia is sponsoring a tennis court, and that "it is the purpose of the city and the Tuscumbia Young Men's Club to permit and encourage the public to assemble and engage in the athletic sport of tennis." The tennis courts are not maintained for any private use or purpose, but for the benefit and enjoyment of all the inhabitants of the city and community.

■ A tennis court is not a nuisance per se, and there is nothing in the complaint to show that these tennis courts are conducted in any manner contrary to plain, sober and simple notions. It is not averred that the attending noise and lights complained of are excessive, or that the noise complained of is louder or the lights brighter than usually attend games of this character. Therefore, it is not shown that the tennis courts are conducted in such a manner as to create a nuisance. For aught that appears in the bill of complaint, the tennis players and those who assemble there are orderly and refined, and the place is conducted with the utmost decorum.

■ The real issue in the case is thus limited to the inquiry as to whether the installation of tennis courts within the confines of the common is such a deviation of this area to improper uses as to call for the restraint of the courts. The industry of counsel for appellants has produced no case holding that such a use is improper. For analogy see Caulfield v. Berwick et al., 27 Cal.App. 493, 150 P. 646.

The respondents, the city commissioners of Tuscumbia, are the legally constituted board of trustees of the municipality, selected by the votes of its electors from their own number to direct its affairs, doubtless with a view to their known qualities of wisdom and discretion in the prudential management of their particular community. It is to be presumed that these officials will perform their duty and will surround whatever proper uses they determine to make of a portion of the common with such suitable restrictions as will not only render such uses inoffensive to the feelings of any of their fellow citizens, but will also safeguard them from undue extension and abuse.

There is no error to reverse, and the decree of the lower court is affirmed.

Affirmed.

BROWN, SIMPSON and STAKELY, JJ., concur.