McCullom v. Black Hawk County.

1. Bridges: COUNTIES AND CITIES. Under the laws of this State counties are liable in certain cases for injuries caused by defective bridges upon the public roads or highways of the county; but this liability does not

arise (in the absence of convention) as to injuries caused by defective bridges within the corporate limits of cities of the second class after the organization of such cities has been matured by the election of officers.

*Appeal from Black Hawk District Court.*

TUESDAY, DECEMBER 11.

UNSAFE BRIDGES WITHIN CITY LIMITS: WHO LIABLE. — Action against the county of Black Hawk for the value of a team of horses drowned, and damages to wagon and harness, caused as alleged, by "the insufficiency of a bridge over a stream known as Dry Run, situate on the public highway between Waterloo and Cedar Falls in said county, which bridge, by reason of its insufficiency, fell while plaintiff's team was passing over, precipitating the same into the stream," &c.

Answer: First, in denial; second, that plaintiff's injury was caused by his own neglect; third, that the bridge was made dangerous by reason of a sudden rise, which fact was known to plaintiff and unknown to defendant; fourth, that the bridge was within the limits of Cedar Falls, a city of the second class; that it was built and repaired by the city under whose care it was, and the same was not in the charge, care or control of the county.

On the trial, the plaintiff proved the falling of the bridge on the 19th day of March, 1865, and the loss of his team and damage to wagon and harness as alleged. The evidence tended to show that the bridge was and for some months had been in an insecure and dangerous condition, although it was being daily used. While plaintiff's team was upon it, one of the stringers gave way drowning the plaintiff's son and team. The water was high at the time, but not running over the bridge or the road approaching it. It was testified on the trial that there had been a freshet in January, which took out the

props, and these remained out for some little time, but were again put in, and remained a little time, when one went out. There was one prop in on the 19th day of March (the day of the accident). The one that went out did not go out by any freshet."

It was also shown by the testimony that the bridge "was situated near the south edge, outskirts or suburbs of the city of Cedar Falls" and that it had been standing a number of years.

One Jacqueth testified, that "in March, 1865, he was road supervisor for district number one, Cedar Falls township; was acting as such at that time and had been from October before. District number one embraced the city of Cedar Falls and more than the city limits. Dry Run bridge was in said district. Witness took charge of said bridge and made repairs as road supervisor and not as city officer. Witness was not a city officer at that time. Witness had charge of the highways and streets of the city of Cedar Falls, and worked the same during the year 1865, as township road supervisor."

Caleb May testified, that the bridge "was kept in repair by the township road supervisor the same as other public roads, and that he was a councilman of the city on the 19th day of March, 1865. The bridge was built before the city of Cedar Falls was organized. That he did not know of any money having been raised by the city for road purposes before the accident; there was money raised by the city in 1865, but it was after the accident to the plaintiff's team. We elected a street commissioner after that."

"The city of Cedar Falls was organized" (so it was testified by Jacqueth) "as a city of the second (2d) class March 1, 1865, and was incorporated as a town in 1859."

Defendant admitted to the jury "that the bridge was

built at the county expense and before the incorporation of the city of Cedar Falls."

The following stipulation was read in evidence: "It is agreed that the bridge is within the corporate limits of the city of Cedar Falls, and on a street therein, and on the county road leading from Waterloo to Cedar Falls, in said county, which road was laid out before the incorporation of said city."

The plaintiff asked the court to charge "that if the bridge was built and maintained by and was up to the time of the accident under the exclusive care and control of the county and township road supervisor and is on a county road, the county is liable, provided the damage occurred in consequence of carelessness in failing to keep said bridge in repair, and provided, further, plaintiff did not, by his own negligence, contribute to said accident." This was refused.

The court also refused to charge "that if the bridge was on a county road and maintained and repaired by the road supervisor of the township, and the damage was occasioned by the insufficiency of the bridge, the jury must find for the plaintiff."

The court also refused to charge "that if the city never assumed any control or charge of the bridge the county is liable for any damage which may have accrued to the plaintiff on account of the insufficiency or insecurity of the said bridge." The plaintiff excepted to these refusals.

The court gave the converse of these propositions (at the instance of the defendant), charging as follows:

"If the bridge in question was located within the corporate limits of the city of Cedar Falls, the county is not liable."

To this the plaintiff also excepted.

The jury returned a general verdict, "no cause of action."

They also found specially as follows :

1. That the plaintiff lost his property by reason of a defect in the bridge as set forth in his petition.

2. Its value was $438.

3. Plaintiff was not guilty of any negligence, and used reasonable care to guard against danger in attempting to cross the bridge at the time of the loss.

A motion for a new trial was overruled, based upon alleged errors in charging and refusing to charge, and because the general and special verdicts were inconsistent.   Judgment was rendered for the defendant for costs, and the plaintiff appeals.

He assigns as error the same matters upon which he based his motion for a new trial.

*Bagg, Allen & Miller* for the appellant.

· *Bishop & Bowers* for the county (appellee).

DILLON, J.—The cause has been stated with considerable fullness, to the end that the exact state of the record

1. BRIDGES: might be seen and the legal question presented
counties and
cities.       (which is one of no ordinary interest), precisely apprehended.

The question is, in this State, a new one, and is not touched by the cases of *Bell* v. *Foutch* and *Barrett* v. *Snooks, ante.*

Those cases decided this point, viz. : that it was within the power of a county, if it saw fit to do so, *to aid* in the erection of a *free bridge* upon a *public line* of travel over a large stream of water dividing the county, though such bridge was within the limits of an incorporated city, it appearing that the erection of the bridge was with the *concurrence of the city authorities.*

Upon which, the city or county, would rest, by law, the duty of keeping the structure when erected *in repair*, was

a question not involved in those cases, and not decided, but expressly left open.

Under the decisions in this State, counties are liable in certain cases for injuries caused by defective bridges upon the public roads or highways of the *county*. *Wilson & Gustin* v. *Jefferson county*, 13 Iowa, 182; *Brown* v. *Jefferson county*, 16 Id., 181. How extensive this liability is, and whether it extends to *all* bridges, small as well as large, we need not stop to discuss in the present case. So cities, when made separate road districts, or having the care and control of their streets with the power to repair, and to levy taxes by means of which they can execute their powers, are liable for the safe condition of their bridges.

This was held in *Rusch* v. *City of Davenport* (6 Iowa, 449). And the correctness of this holding is a point in municipal law which has ceased to be debatable. *Weightman* v. *City of Washington*, 1 Black, U. S. R., 39; *S. P.*, 2 Id., 590; *Chicago* v. *Robbins*, 2 Id., 418; *Ene* v. *Swingle*, 22 Pa. St., 384; *Storrs* v. *Utica*, 17 N. Y., 104, 16 Id., 159; *Browning* v. *Springfield*, 17 Ill., 143; *Smoot* v. *The Mayor*, 24 Ala., 112; *Dayton* v. *Pease*, 4 Ohio St., 80.

The record presents the question whether, in the case at bar, the liability to the plaintiff is upon the county.

Under the decisions above referred to, holding the county responsible for the safety of *its* bridges, it is clear that the county having erected the bridge in question upon a public road or highway, and being aware of the condition of the bridge (granting for the argument that such knowledge is essential to liability), or in fault, if it or its officers were not cognizant of its unsafe condition, it is clear we say, that the *county* would, under these circumstances, have been liable to the plaintiff, if the *town* of Cedar Falls, which was not a separate road district

(Rev., § 891; Laws 1862, ch. 163, § 1), had not, prior to the accident, been changed, conformably to statute, (Rev., §§ 1078, 1080), into a city of the second class, and as such invested by law with the power to control its own bridges, certainly all bridges not over large, or navigable streams, if not indeed *all* (Rev., § 1097; *Bell* v. *Foutch, ante,* p. 129), and charged with the duty of keeping them in repair. Rev., § 1097.

But the *town* was thus transformed into a *city* March 1, 1865. The accident did not happen until the 19th of that month, and the difficult question is, what was the effect of that change?

· When this change was made and how made, the record does not very clearly show, but it seems to us that it warrants the conclusion that the change was matured, consummated, perfected, on the 1st of March. May testifies that "he was a councilman of the *city* on the 19th of March, 1865," and by law (Rev., § 1093) councilmen are elected on the first Monday of March in each year. It is also testified that Cedar Falls was "*organized* as a city of the second class March 1, 1865."

We repeat that it seems fair to infer that the change into a city was complete; that an election for city councilmen was held on the first Monday in March, and these, and perhaps other officers, belonging to and necessary to perfect a corporate organization *as a city of the second class,* were then elected.

We should deem it right to hold the county liable until the new organization has a matured existence. But it has such an existence when it has elected its own officers to guard its rights and exercise its power. Does the liability of the former organization longer continue?

In the absence of convention, we hold that it does not.

It would not do to give two distinct sets of officers control over the same bridge. There would be, or might be,

conflict of jurisdiction. The money and. means . they expend come from different sources, and cannot be applicable to the same objects. Therefore, when the liability of the city attached, that of the county ended, and that of the city attached when its organization was complete ; and its organization was complete and an existence of its own began when it had agents and officers of its own to exercise and execute its corporate powers and faculties.

Assuming, as this opinion does, that the city council was duly elected and organized prior to the day of the accident, then, by law (Rev., § 1097), the city council had " the care, supervision and control of all public highways, *bridges*, &c., within the city," and it is made the duty of the city council " to cause the same to be kept *in repair*." Id.

But it may be said that the city was just born, and born, too, without patrimony or assets, and, therefore, it is hard to hold it liable to remedy defects which are remediable only by money.

We admit the force of the objection ; but it is answered by the following suggestions : First, it does not appear but that the " town " of Cedar Falls, out of which the " city " came, and to whose rights and property it became entitled, had means in its treasury, which the city council could have used to make the bridge safe. Second, *if there* were no means in the treasury, power is given (Rev., § 1129) to make loans, in anticipation of the incoming of the regular revenues. Again, third, if there were no money in the city treasury, and if the city could not borrow, the council could have escaped liability by causing, by its marshal, or some other officer or agent, access to the bridge to be barred up or closed.

In this view it is no defense to the city that it had no road money on hand, nor opportunity to raise it by taxes

at the time of the accident; nor that it had not then elected or appointed a street commissioner or officer. It is urged, as a ground of liability against the county, that both *before and after* the accident, during 1865, the township, and not the city, officers had charge of the bridge in question.

If, as before shown, the powers of the township officers over the bridge ceased when the city was fully organized and had its own officers, and if these two independent sets of officers could not both be charged concurrently with the power and duty to repair, it follows (considering that the county would not be bound by the voluntary and unauthorized acts of township road officers) that the mere fact that these road officers continued to exercise their powers *within* the city limits, would be an immaterial circumstance, at least one which would not, of itself, without more, impose a liability upon the county which would not otherwise exist. It is to be borne in mind that there is nothing in the record to show that the county board of supervisors authorized or directed the township road officers to retain charge of or to repair the bridge after the 1st of March. There is nothing to show that the township road officers, much less the county or its officers, retained charge thereof against the wish of the city, or would not surrender the same to the city, and nothing to show that there was any contract between city and county, or its officers, whereby the county was to keep the bridge in repair, or in safe condition.

We have felt, and still feel, the difficulty surrounding the question, but we believe the view we have taken to be the correct one.

It has this in its favor: *it is plain.* To protect the public we hold that there is an unbroken chain of liability; that the county having erected a bridge is liable till the city organization is complete; that when complete

the city becomes at once liable, and the liability of the county at once (in the absence of convention) determines. If it should be held that the county is by law liable *beyond* the period when the city organization is complete, when is that liability to end, and what determines it? Clearly it does not *always* continue to exist. It does not by law. co-exist with that of the city. When does the liability of the city begin unless from the time its organization is perfected? We see no plain and practical rule except the one we have adopted.

Without quoting, we may observe that counsel will find, on examination, that the following authorities very strongly support the views maintained in this opinion: *Ottawa* v. *Walker*, 21 Ill., 605; *The State* v. *Jones*, 18 Texas, 874; *Gilman* v. *The County*, &c., 5 Cal., 426; *The State* v. *Clark*, 1 Dutch. (N. J.), 54; *Pope* v. *Commissioners*, 12 Rich. (S. C.), 407; *Uniontown* v. *Commonwealth*, 34 Pa. St., 293; 18 Id., 66; *King* v. *Oxfordshire*, 4 B. and C., 194; *S. C.*, 10 Eng. C. L., 540.

The result is, that if we have not misapprehended the record in relation to the time when the city organization became *perfect*, the judgment must be affirmed.

If the city organization was not perfect the plaintiff's remedy was correctly sought against the county.

The plaintiff should not be cast in this suit on the ground that his remedy is against the city, inasmuch as its corporate organization was complete, and then in his subsequent action against the city be also defeated because it should be then shown that it had not fully passed from an embryonic to a perfect and independent existence.

The record before us is not indisputably clear on this point. We are solicitous in the order we make, not to prejudice the rights of parties. On the assumption that we have correctly construed the record, we affirm the

order of the District Court denying a new trial, but remand the cause with this direction: that if it is made to appear to the District Court by a showing to be made at its next term, that at the time when the accident happened there had been no regular annual election for the city councilmen and officers properly belonging to the corporation as a *city of the second class*, then a new trial should be ordered, upon such terms as to costs as the court deems just.

Affirmed.