GARNET FAY FLOREY, a minor, by Andrew J. Florey, her father and next friend, appellee, v. CITY OF BURLINGTON, appellant.

No. 48839.

(Reported in 73 N.W. 2d 770)

DECEMBER 13, 1955.

318

F. M. Holsteen, City Attorney, and Ben P. Poor, both of Burlington, for appellant.

Pryor, Hale, Plock, Riley & Jones, of Burlington, for appellee.

SMITH, J.—Defendant, City of Burlington, maintains Crapo Park, situated on a bluff overlooking the Mississippi River. On July 30, 1953, plaintiff, Garnet Fay Florey, a thirteen-year-old girl, fell off a cliff in the park and suffered personal injuries for which she brings this action by next friend. The jury returned verdict in her favor upon which judgment has been entered. The defendant has appealed.

The action is based on alleged negligence of the City in failing to maintain a fence, guardrail or other barrier, to post warning signs or notices to advise of danger, or to have on duty a guard to warn plaintiff and the public generally of the danger of the trail or path plaintiff claims she was traversing when she fell. The city claims "governmental immunity", among other defenses.

The statement of facts and description of the location as set out in defendant's brief is accepted by plaintiff as substantially correct. We adopt it herein, somewhat condensed and in part directly quoted:

Plaintiff, a resident of Beardstown, Illinois, with her brother-in-law, Charles Burton and family who live in Burlington, and another sister, Pat, 16 or 17 years old, were picnicking in the park. Mr. Burton (28) volunteered to take the girls to Black Hawk Cave and Spring in a lower part of the park. Burton led the way. Plaintiff followed with Pat behind her.

"They went down the concrete block steps below the horseshoe" (name of an oval-shaped drive) "to the upper of two formal nature trails running longitudinally along the side of the bluff. Proceeding northeasterly upon such nature trail they skirted the barrier along its easterly side and went around the

end * * * and onto the steep face of the bluff that had a 55% grade running down 40 feet southeastwardly to the brink of a 12½ foot stone cliff extending to the lower level nature trail."

There is a dispute of fact at this point. Plaintiff's witnesses refer to a "path" which ran down a steep slope to the brow of the cliff. Defendant's witnesses positively deny its existence. There is some suggestion that the "path" was due to water erosion, rather than to human travel.

Defendant's statement continues: "The steepness of the grade forced both the plaintiff and Mr. Burton into a run. Burton veered to the north when he got to the cliff and grabbed ahold of some trees. * * * Plaintiff was not so fortunate and went over the cliff and suffered the injuries for which she asks damages in this case."

By a complex system of division and classification defendant's brief states the "issues" in "divisions" numbered I to X and then subdivides them into "points" I to XX. We shall try to cover the ground without following the same order of arrangement. It may be conceded the legal trail, like the park "path", is controversial.

I. Defendant first cites numerous cases to the proposition that: "Iowa is firmly committed to the doctrine" municipalities are not subject to the rule of respondeat superior "while performing a public service", i. e., that they enjoy so-called "governmental immunity." Most of these cases relate to negligence of municipal agencies and employees in various activities—enforcement of sanitary regulations by the board of health, making of arrests by peace officers, acts of firemen in performance of their duties, negligence of city employee in mowing weeds or in operating a grading machine, or a city-owned car or truck, negligence in the operation of a bathing beach and a municipal airport. These and many other cases make clear that Iowa courts do not reject the doctrine entirely.

The municipal corporation is not liable for negligent acts of its employees engaged in performing governmental functions. But it is liable, as is a private corporation, for their negligence in performing proprietary duties; and it is not immune from liability for damage due to dangerous conditions

resulting from its own misfeasance or nonfeasance in governmental matters.

The immunity doctrine, as to cities and towns, doubtless came with the emergence of the municipality as a corporate body, more definite than a mere territorial subdivision, and with certain governmental and proprietary powers delegated to it by the sovereign state. The dual character of the corporation thus created probably accounts in a measure for the problems of immunity that have arisen. The analogy between the doctrine and the ancient (and archaic) maxim, "the King can do no wrong", probably had a part in its inception, but more practical considerations have been urged both for and against it. It is not complete immunity from judicial accountability such as is accorded the state—only freedom from the rule of respondeat superior where the servant is engaged in governmental activity.

This immunity doctrine is said to have been first announced in 1798 in an English case, Russell v. Men of Devon, 2 Term Rep. 667, 100 Eng. Rep. 359. See Prosser on Torts, 1955 Ed., 774.

Various tests for determining whether immunity does or does not exist in a given case have been suggested: Is the proposed activity or function governmental or proprietary? Is it ministerial or administrative or judicial? Is its performance mandatory or discretionary?

It has been urged in support of the doctrine that the corporation derives no profit from the exercise of governmental functions which are solely for public benefit and are frequently mandatory, and that it would be unfair to hold it liable under the rule of respondeat superior; and on the other hand that it is better the losses due to tortious conduct of municipal employees in such affairs should fall on the municipality as a cost of administration than on the injured individual. See Prosser on Torts, supra. The trend is said to be away from the immunity doctrine, see annotation 75 A. L. R. 1196; 63 C. J. S., Municipal Corporations, section 746, page 33. Possibly this is, as defendant suggests, an "intrusion of personal ideas and impulses into the deliberations of sober, calm and educated thought and research."

Our own opinion is that though the doctrine is largely of common-law origin, any substantial modification of it must come

by legislation. Our duty is to interpret our statutes and precedents and apply them to conditions as they arise.

 II. The municipality, like any private corporation, is subject to tort liability and the rule of respondeat superior, when engaged in purely proprietary activity. The problem arises when it performs governmental functions committed to it by the state. Such functions do not become proprietary by their delegation. Nevertheless tort liability may arise if the municipal corporation negligently fails to perform its governmental duty and dangerous conditions result which cause injury to one properly availing himself of the tendered service.

In a quite early day (1868) Judge Dillon, speaking for our court, laid down the broad principle:

"Thus, incorporated cities and towns, wherever they are invested by their organic or constituent acts with general supervision and control over their streets, with power to grade and to improve them, and with the power to levy taxes or raise revenue, which may be used for the purposes of such repair, are held liable, without any statute expressly giving the action, for injuries *caused by unsafe and defective streets.* [Emphasis supplied.]

"To this effect may be found decisions in almost all, if not in every State of the Union." Soper v. Henry County, 26 Iowa 264, 268.

He then cited Rusch v. Davenport, 6 (Clarke) Iowa 443; McCullom v. Black Hawk County, 21 Iowa 409, and twelve cases from other jurisdictions.

 Our decisions since have not run counter to that pronouncement. There is however frequent reference in cases of this character to the statute now known as section 389.12, Iowa Code, 1954: "They [cities and towns] shall have the care, supervision, and control of all public highways, streets, avenues, alleys, public squares, and commons within the city, and shall cause the same to be kept open and in repair and free from nuisances." This statute was formerly section 5945, Code of 1939. It originated in substantially the present form in 1858, and has persisted through all succeeding Codes. In many of our cases it seems to be assumed the municipal liability for tort

springs from the statutory mandate embodied in the last clause of the statute. We agree however with Judge Dillon's statement above-quoted that it arises from the delegation of power and failure to maintain highways and public premises in safe condition for use by the public. With equal logic it applies in case of public parks.

The functions enumerated in the statute are not merely *public,* but are, in modern practice at least, essentially *governmental* in character. The first four are overlapping and refer to passageways or thoroughfares, no longer thought of as adapted to private management and maintenance or exploitation. The same is true of "public squares, and commons within the city."

Time and custom have converted all these activities into functions of government. This does not mean they belong in the category of "public utilities." The statute, in placing them under municipal control, has not converted them into proprietary functions, comparable to municipal lighting or transportation.

But in delegating them the state has commanded the municipality to "cause the same to be kept open and in repair and free from nuisances." The latter is merely declaratory of the implied mandate of the common law, implicit in the delegation. If a failure to perform this duty results in an unsafe condition that causes injury to an individual lawfully availing himself of the tendered service, the misfeasance (or nonfeasance as the case may be) is that of the municipality itself. Liability is not predicated upon the doctrine of respondeat superior, but upon the corporation's own negligence in failing to keep the thoroughfare reasonably safe for travel or the premises safe for the public use they are designed to serve.

In Mardis v. City of Des Moines, 240 Iowa 105, 34 N.W.2d 620, the injury was caused by the alleged negligence of street cleaners, engaged in removing debris from the streets. Liability was not claimed for any failure of defendant-city to keep its street in a safe condition for travel. It was held the city was not answerable for the personal negligence of its employees in performing their work of keeping the street in a proper condition. The rule of respondeat superior did not apply. The negligence of the employee was not that of the city.

The decision aptly illustrates the distinction between cases, on the one hand, of municipal *nonliability* for injury inflicted by public servants while negligently performing their governmental functions, and on the other, municipal *liability* for injury caused by dangerous conditions due to the municipality's own negligent failure to perform its delegated duty. The same is true of the decision in Norman v. City of Chariton, 201 Iowa 279, 207 N.W. 134. In fact, while not always spelled out, the principle laid down by Judge Dillon will be found to underlie and explain most of our cases concerning either streets or parks.

The decision in Cox v. City of Des Moines, 233 Iowa 272, 275, 7 N.W.2d 32, reached the right result by impliedly denying the governmental character of municipal park maintenance. In Woodard v. City of Des Moines, 182 Iowa 1102, 165 N.W. 313, the liability of the defendant-city was predicated upon the statute (now Code section 389.12) holding that the words "public squares, and commons" would include "parks."

■ III. It is argued strenuously that there is no mandate to municipalities to keep parks reasonably safe for public use, since Code section 389.12 does not use the word "parks" and they do not come within the designation "public squares, and commons."

Attorneys, in a rather violent burst of rhetoric, exclaim: "Not without the wildest stretch of an irrational imagination, and not unless it was the legislative intent to include it, did a park come within the statute's provisions."

Another statute, Code section 389.1, gives cities "power to establish, lay off, open, widen, straighten, narrow, vacate, extend, improve, and repair streets, * * * public grounds, parks and play grounds * * *." Its statutory predecessors, sections 464, 465 and 527, of the Code of 1873, and section 751, Code of 1897, did not mention "parks." That word seems to have crept in since 1897. That it has not been included in section 389.12 is not too important.

In 1892 the Missouri Supreme Court discussed the meaning of the word "common." After canvassing definitions of the words "common" and "park" as found in various dictionaries it concluded "that 'common' is by no means the synonym of 'park' or 'pleasure ground,' but possesses a much more comprehensive

meaning." Goode v. City of St. Louis, 113 Mo. 257, 271, 20 S.W. 1048, 1051.

In other words it found the word "parks" may be included in the broader term "commons." We find Webster's International Dictionary defines common or commons as "Land held in common as by a community, now often used as a park." Worcester is cited in the Goode case (on page 270) as defining "common" as: "a term sometimes applied to an inclosed public ground or park, in a city."

We conclude that parks are within the purview of Code section 389.12. Woodard v. City of Des Moines, 182 Iowa 1102, 1106, 165 N.W. 313. We find no reason for a different conclusion in the language of section 1 of chapter 127, Acts of Tenth General Assembly, argued in defendant's brief: A "town or city may purchase lands * * * for the public use as squares, parks, commons or cemeteries * * *"; and again in chapter 80, Acts of Thirteenth General Assembly (1870) where are enumerated "public squares, parks, commons, cemeteries, hospital grounds, or any other proper and legitimate municipal use * * *."

The enumeration in present Code section 389.12 ("public highways, streets, avenues, alleys") illustrates the legislative habit (not unknown to lawyers) of overlapping enumeration. No one would seriously argue that avenues are not streets or that both are not public highways. By the same token the naming of both "parks" and "commons" in the cited legislative Acts does not deny their essential relationship.

However we deem it unnecessary to base our decision upon such narrow ground. That the legislature has entrusted to municipalities authority to maintain parks located within their borders is sufficient to make them liable if their failure to perform the duty of safe maintenance results in "unsafe and dangerous" conditions, causing injury to one exercising due care in availing himself of the facilities offered.

■ IV. Defendant argues: There is no substantial evidence of any breach of duty owed by defendant to plaintiff or of any defect in any path; and that there was uncontradicted evidence the acts of plaintiff's brother-in-law, Charles Burton, were the proximate cause of the accident.

The first contention seems to refer to the disputed existence of a path. There is however a conflict of evidence on it sufficient to make it a jury question. One witness refers to a "choice of two paths, which were plainly visible—well-defined paths. I took one going in the easterly direction—I led, Garnet was behind me, and Pat was following her."

On cross-examination he says: "There appeared to be a path leading down to the east. I am sure it was a path, it wasn't a wash, it had a beaten look of a path. Obviously people went down the bluff there, beat it down, and compacted the earth."

The civil engineer who took the levels and testifies to a 55% grade refers to "the path I took the levels on." He says: "It is clearly visible to the eye, it is a well-beaten path." On cross-examination he refers to it as a "sort of a connecting path leading from the top down to a lower grade."

Both plaintiff and her sister call it a path. We have no doubt there was sufficient testimony to present a jury question. And there is ample evidence of the danger of the situation and absence of reasonable precaution against what did in fact happen. It was for the jury.

Instruction 8 properly stated the duty of the defendant was to exercise ordinary care to maintain well-defined footpaths in a reasonably safe condition for pedestrian travel thereon.

The recent case of Nicholson v. City of Des Moines, 245 Iowa 270, 60 N.W.2d 240, correctly holds it is the duty of the city to maintain barriers to guard against injury to wayfarers, though some members of the court thought the scene of the accident in that case too remote from the actual path of travel.

V. Instruction 10½ was also proper. It told the jury: that if it found the defendant was negligent under the instructions, that such negligence was the proximate cause of plaintiff's injuries and that she was free from contributory negligence, then she would be entitled to recover even though the negligence of some other person concurred in causing the injury.

We find no reversible error in these instructions. No. 8 assumes Code section 389.12 to be the foundation of plaintiff's claim. There is abundant precedent for this view. But, as we have seen, the liability of defendant-city primarily rested on an

obligation imposed by law and growing out of the fact it had been invested with general supervision and control of public park whether by Code section 389.12 or section 389.1.

The judgment must be and is hereby affirmed.—Affirmed.

OLIVER, C. J., and BLISS, GARFIELD, HAYS, THOMPSON, LARSON, and PETERSON, JJ., concur.